Good morning, everyone. This is Judge Sykes, and Judges Easterbrook and Keeney are on the call as well. We are ready to begin with today's telephonic arguments. Before we do, I will ask everyone's patience with the telephonic form of arguments, and if there is cross-talk, we will do our best to avoid interrupting one another, but I ask everyone's continued patience with this form of argument. I will serve as the timekeeper today, and we'll give counsel a one-minute warning when approaching the conclusion of your argument time, and then we'll announce when argument time has expired. With that, I will call the first case this morning, which is Escobedo-Marquez v. Barr. Ms. June. Good morning, Your Honor. Can you hear me? Yes, I can. Okay. Thank you. Good morning. May it please the Court, Elisa Drew on behalf of the petitioner Gabriela Escobedo-Marquez. Gabriela Escobedo cannot return to her native country of Mexico and live an open life as a gay woman without running the risk of persecution. The petitioner maintains she suffered past persecution in the form of imminent threats of rape harm to herself and her children. She argues that the intent by a private actor to overcome her sexual orientation was at least one central reason for his conduct. She asserts that police did nothing to protect her after she filed a complaint. She claims that her past persecution leads to a presumption of a well-founded fear of future persecution, as the never-punished perpetrators of that harm could still carry out the threat if she returned to Mexico, even today. Despite the government's argument that the petitioner waived a well-founded fear of future persecution on account of her past harm, should this Court, in fact, find that past persecution was established, there would be a rebuttable presumption of future the petitioner did not experience harm that rose to the level of persecution, or that the motive for inflicting the harm was not to overcome a protected trait. Gabriela argues that she cannot return to Mexico for three other reasons. First, pattern of practice. To prevail with the pattern of practice of harm to the petitioner's protected group of LGBT persons, which is lesbian, gay, bisexual, transgender persons, she must show a systematic, pervasive, or organized effort to kill and imprison or severely injure members of the protected group, and that effort must be perpetrated or tolerated by state actors. It's true that Mexico has enacted laws providing LGBT people with legal rights. The immigration judge, the Board of Immigration Appeals, and the Department of Homeland Security seem to think that the existence of this legislation proves there is no persecution that is allowed by the government, or that no persecutory patterns or practices even occur. However, the Mexican government is not off the hook from the pattern of practice argument, simply because of the that there should be no violence toward gay people. But government actors that are charged with enforcing those laws and assuring protection to LGBT people seem to tolerate violence toward LGBT people very well. There is a documented high level of impunity for many human rights violations, but particularly high impunity for violence against the LGBT community because of miscategorization and under-reporting of crimes against gays, there is every reason to believe that the reported level of violence does not reflect the true, pervasive, systematic, and organized efforts to severely injure LGBT people. The actual level is extremely important since the degree of pattern or practice of persecution must be high. Because of persecution of the protested group is established, every member of the group would be eligible for relief, and the floodgates indeed would open. But Che Che the Holder says that the size of the group should not be a factor in disqualifying the members for asylum, because that would unfairly provide no relief to people who actually need it. The record reflects miscategorization of crimes, including murder, as crimes of passion. Under-reporting comes from lack of coordination between police and the gay community, a choice that the government is making. The gay community should be taken seriously, as interviews in a safe environment show that the crime levels are extremely high. That six of ten people reporting in a survey of There is a stronger pattern of violence against gays in small, rural, less diverse locations in Mexico as compared to big cities. As Gabriela testified, that's the place where she's going to be living, those kinds of small, rural places where the pattern of violence is the strongest. So, as witness to FOIA wrote in her sworn declaration, what the law says is one thing, how people act is another, to FOIA attested to witnessing violent acts against people in the same place where the petitioner resided. And despite the existence of laws, witness Gutierrez experienced very menacing conduct from the police. She saw her friend being pawed by a police officer and testified that she herself received calls from another cop among those who ordered them in the police car for no legitimate reason. Those calls were so disturbing that Ms. Gutierrez left Mexico. How people act and what they do and don't do is in control of the government, which doesn't do enough to deter violence against gays. All of these arguments concerning the lack of impunity for criminal violence to LGBT people, the mis-categorization and under-reporting of crimes against LGBT people, which would reveal a stronger pattern of violence than what is officially reported, and the fact that there is pronounced violence against this group outside of large metropolitan cities was not addressed, those factors were not addressed at all by the immigration judge, by the Board of Immigration Appeals, or by DHS in its response. Ms. Gutierrez, what is the evidence on this pattern of practice? Your Honor, as cited, all of this is documented in the State Department's country report. There's a U.N. article as well as other articles and the petitioner's testimony and her in-court witnesses are all the sources of the pattern and practice of persecutory acts against the LGBT community outside of large and diverse cities. It's stated repeatedly. What was the date on that report? Well, this was a 2016 report. I believe that was updated in 2017. May I continue? Yes, you may. Oh, thank you. Thank you, Your Honor. You have one minute to your rebuttal, Ken. Okay. The petitioner also argues that there's a well-founded fear of future economic persecution. To establish that, we have to show that there's a deliberate imposition by the government of severe economic disadvantage, which basically deprives her of the essential device. There are laws that prohibit employment discrimination, and we know that general conditions of crime and poverty are not a basis for asylum or that employment discrimination by itself is an insufficient claim for economic persecution. However, according to the State Department, in a survey that was conducted at that time in 2016, about half of LGBT people surveyed reported employment discrimination that the government hasn't effectively enforced laws to protect them. You are now in your rebuttal time. Okay. Thank you. And you said that I had a minute, Your Honor? You're into your rebuttal time now. You reserved two minutes, so you're into that time at this point. Okay. Well, I just want to briefly say that, again, this issue of economic persecution is not that the employment discrimination itself is persecutory, but rather that the outcome is persecutory, and it is for this petitioner in this environment. She can't compete for well-paying jobs, and she's going to be discriminated against the menial jobs that she would happily take, and there, again, is documentation for that on the record. There's also persecution by proxy. The concern there is not that her daughter, who attempted suicide four and a half months before the individual hearing, that she tried to commit suicide because she was bullied on account of her mother being a lesbian. That isn't the argument. It's that she had a very self-destructive response to being bullied. We think of this in terms of possibilities, Your Honor, not probabilities. This is an asylum case, after all, and we assert that it is possible, that it's not speculative, to conclude that Diana Giulietta would be bullied in a conservative and homophobic environment where her mother would want to live, that she has every right to live, in an openly gay lifestyle. And it's a prediction of likelihood, the analysis that has to occur in an asylum claim. Pursuant to Cordozo-Fonseca, it could be as low as 10%, and there's no reason even now to conclude that Diana Giulietta is capable of withstanding that bullying. Ms. Drew, your time has expired. Thank you, Your Honor. Thank you. Mr. Bates. Good morning, Your Honors, and may it please the Court. I'm Christopher Bates for the Respondent. Under the substantial evidence standard, it is the petitioner's burden to establish that the evidence compels the conclusion that she suffered past persecution or has a well-founded fear of future persecution. The petitioner has not met this burden, and accordingly, the Court should deny the petition for review. Starting with the petitioner's claims of past persecution, the Board determined that the petitioner had not shown past persecution on two grounds. First, that the threats in this case did not rise to the level of persecution. Second, that the petitioner had not established a nexus to a protected ground. With regard to the threats in this case, this Court has held that threats can constitute past persecution only in the most extreme circumstances, such as where they are of a most immediate or menacing nature or the perpetrator's attempt to follow through on them. And in particular, I would draw the Court's attention to the Basula case, which we saw in our brief, where the conduct there, the threats there, were at least as severe as the threats in this case. The applicant in that case received a weekly call threatening to finish him. His house was attacked by people throwing rocks. He was again approached on the street, told that he would be finished. His car was run off the road. And in that case, the Court found that the evidence did not compel the conclusion that the threats in that case constitute past persecution. And that is true in this case as well, because, again, threats can constitute past persecution only in the most extreme circumstances. With regard to whether the petitioner has established a nexus to a protected ground, it is clear from the INA that the protected ground must be one central reason for the persecution. And this Court has made clear in a number of cases, for instance, from the Marquette case, which the immigration judge cited in its decision, that a personal dispute, no matter how nasty, cannot support an alien's claim for asylum. And here the petitioner testified at her hearing that the reason for the threat was a past relationship that she had had with a woman named Yasmin de la Soto. The petitioner testified, I know why I was being threatened, that it was because of a girl named Yasmin de la Soto. The petitioner further testified, I think I'm sure that the threat came from a woman named Alondra and that Alondra did it out of jealousy for the petitioner's relationship with Yasmin. And in this case, that testimony indicates that the threats here were not on the basis of the protected ground, but they were retaliation or retribution for a personal dispute over jealousy from a former relationship. And in this regard, Your Honors, I would point in particular to the Matrebek case, which we cite in our briefs. The petitioner has alleged that because in some of the threats, the petitioner was insulted and called a lesbian, and that establishes a nexus to a protected ground. But I would draw the Court's attention to the Matrebek case, where this Court said that when a persecutor utters, in that case, an ethnic slur during an encounter that appears to be motivated by other factors, the slur does not necessarily prove a nexus to a protected ground. The reasoning there applies here as well. It's clear from the petitioner's testimony that the threats in this case were on account of a personal dispute, personal grudge, and the fact that a slur was uttered during the course of the threat does not necessarily prove a nexus to a protected ground. And certainly does not compel the conclusion that there was a nexus to a protected ground here, which is the standard that this Court applies in reviewing the Board's decision. Turning to the petitioner's claims of well-founded fear of persecution, starting with the pattern or practice claim, this Court has made clear in numerous cases that to establish a pattern or practice, persecution must be systemic, pervasive, or an organized effort to kill and imprison a severely injured member of the protected group, and that this effort must be perpetrated or tolerated by state actors. And that's from the Matrebek case. In the Helene case, which we also found in our briefs, this Court has said that to constitute a pattern or practice, persecution must be extreme. And this Court has explained that the reason that the Court applies such a high standard to pattern or practice claims is because once the Court finds that a group is subject to a pattern or practice of persecution, every member of that group is then eligible for asylum on the basis of membership in a protected group. So this Court does apply a very high standard to pattern or practice claims. And a comparison with other cases where this Court has found the evidence not to establish a pattern or practice indicates here that the evidence in this case similarly does not compel the conclusion that there is a pattern or practice of discrimination in Mexico. I would draw the Court's attention in particular to the Matrebek case, which we cite in our briefs. There, the group that had experienced discrimination was Roma or Romani in Bulgaria. And in that case, the petitioner submitted evidence that Roma were attacked by private citizens, that they were arrested arbitrarily and beaten by police, that they had faced employment discrimination. But this Court found that that evidence, those allegations, did not rise to that very high standard of a pattern or practice of persecution, in part because the Bulgarian government had engaged in efforts at reform to help to reduce discrimination that Roma faced. This included programs for displaced Roma, as well as a new anti-discrimination statute. And as both the immigration judge and the Board in this case identified, there have been recent positive legal developments for LGBT individuals in Mexico. Among other things, the Mexican Constitution was amended to prohibit discrimination on the basis of sexual orientation. In 2003, the federal anti-discrimination law was amended or passed to prohibit discrimination on the basis of sexual orientation. There are anti-discrimination councils that receive complaints and conduct public education campaigns. And so, as in the Medreira case, it is relevant here that steps are being taken in Mexico to improve the situation. Certainly, the information and evidence that the petitioner points to is troubling, and there is certainly much more work to do in Mexico. But again, the standard that this Court applies to a pattern or practice of discrimination claim is a very high standard. And we would submit that, as in the Medreira case and in other cases that we study in our brief, that standard is not met here. And I would just briefly note that Medreira points to a couple out-of-circuit decisions where other courts have found patterns or practices of persecution, like the Tenth Circuit case involving Afghanistan, where the government had a policy of executing apostates, like the Fifth Circuit case where the Indonesian government has failed to prevent attacks on churches that have led to thousands of deaths. And the evidence in the record here, we would respectfully submit, does not rise to that standard. Finally, Your Honors, on the question of economic persecution, we would emphasize that this Court has made clear in a number of cases that to show economic persecution, the applicant must demonstrate that there has been a deliberate imposition of severe economic disadvantage. So the economic harm must be both deliberately imposed as a form of punishment and must result in severe deprivation. And the cases where this Court has found economic persecution have involved examples such as a fine of up to a year-and-a-half salary, blacklisting for most forms of employment, confiscation of household furniture, as we see in the Chin v. Holder case that we study in our brief. The petitioner has not alleged harms that rise to that level. The petitioner alleges that she may have difficulty finding a job. She says that it will be difficult or that she will be unable to move to Mexico City or other places that are somewhat more cosmopolitan because they are expensive. But this Court has made clear that economic harm that is the result of generally harsh conditions shared by others— Mr. Bates, you have one minute left. Thank you, Your Honor. So the petitioner alleges that it will be difficult for her to find work or that it will be too expensive for her to move to other cities. But she hasn't established that this differentiates her from other individuals in Mexico, that the generally harsh economic conditions in Mexico that she would face are different from those that are generally shared by others. And so, again, given the standard of review here, the evidence does not compel the conclusion that the petitioner has established a well-founded fear of persecution based on the possibility of future economic persecution. If there are no questions from the panel, again, we would ask this Court to deny the petition for review. Thank you, Mr. Bates. And, Ms. Drew, you used all your time, including your rebuttal time, in your opening argument, and so your time has expired. We will take a case under advisement and thank both counsel.